**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-697 (JEB)** |
| **PAUL WESTOVER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Paul Westover ("Westover") to a 90-day term of incarceration and $500 restitution.

**I.    Introduction**

The defendant, Paul Westover, his friend William Merry ("Merry") (Case No. 21-cr-748 (JEB)), and Merry's niece Emily Hernandez ("Hernandez") (Case No. 21-cr-747 (JEB))[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in property damage totaling more than one million dollars.

On December 6, 2021, Westover pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, the

---

[1] Merry pleaded guilty to one count of Theft of Government Property, in violation of 18 U.S.C. § 641, on January 5, 2022, before this Court. Hernandez pleaded guilty to one count of violating 18 U.S.C. § 1752(a), Entering and Remaining in a Restricted Building or Grounds, on January 10, 2022, before this Court. Both are due to be sentenced on March 21, 2022.

government's proposed sentence is appropriate in this case because: (1) Westover was well aware that law enforcement officers were trying to disperse the crowd assembled outside of the Capitol, and yet he surged towards the Capitol Building anyway; (2) he stormed past a group of police officers, which he described as "the front line," after he witnessed another rioter forcibly remove a bike barricade; (3) he penetrated the U.S. Capitol all the way to the Speaker's suite and exited through a broken window; (4) he witnessed and celebrated the theft of government property by his travel companions; (5) he destroyed evidence by deleting photos and videos recorded on January 6 from his Facebook account and cell phone; and (6) his conduct after breaching the Capitol— when the import of his actions should have been clear—suggest a lack of remorse.

Even if he did not personally engage in violence or property destruction during the riot, Westover witnessed and celebrated the violence of that day.  Despite clear efforts from law enforcement officers—e.g., the use of munitions and tear gas—to hold back the crowd, Westover joined the mob in storming past several lines of law enforcement to breach the U.S. Capitol. Undeterred, he shouted, "we're coming, Nancy," as he and other rioters ascended the stairwell to "storm[] … the gates of the Capitol," in his words.  Westover ultimately breached the Capitol and reached the Speaker's suite, where he witnessed rioters pry Speaker Pelosi's office sign from its post above an entryway and smash it against the wall.  He then watched as his travel companions picked up a shard of that sign, which they removed from the Capitol.  Westover even recorded a trophy video of Hernandez proudly displaying the stolen shard on Capitol grounds.

Despite witnessing mob violence and being forced to crawl out of a broken window to exit the Capitol, Westover boasted that he was "tak[ing] our country back."  Specifically, he appeared in an "interview" of Hernandez on Capitol grounds in which the interviewer stated:

"you want to know how to defend your country?  You storm in there and you take your country back.  I'm here with the heroes who actually stormed [unintelligible] and we are actually going to take our country back."[2]  At this point, Westover goalposted his two arms in triumph and exclaimed, "darn right."  Westover then drove with Hernandez and Merry, along with the shard of the Speaker's sign and other items stolen from the Capitol, back to St. Louis, Missouri.

The Court must also consider that Westover's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for Westover's actions and those of his fellow rioters, the riot likely would have failed.  Here, his participation in a riot that actually succeeded in halting the Congressional certification combined his celebration and endorsement of the violence on that day demonstrates why a term of incarceration is warranted.

## II.     Factual and Procedural Background

### a.   *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Offense ("SOO"), ECF No. 37, at 1-7.  As the Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

---

[2] The interviewer does not appear to be affiliated with any news media organization, though public records indicate she is a producer for a TV commercial/advertising company.  It thus appears she was "interviewing" individuals on Capitol grounds for social media or promotional purposes.

   b.   *Westover's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Westover, Hernandez, and Merry (hereinafter, the "trio") traveled to Washington, D.C., from their homes in Missouri to attend the "Stop the Steal" rally.  At the time he traveled, Westover was aware that the Electoral College votes would be counted the next day at the U.S. Capitol.  SOO ¶ 9.

Once on the Capitol grounds on January 6, Westover witnessed a crowd standing against a set of barricades, arguing with the police.  He recorded the moment when rioters breached the police barricades on the outer perimeter of the Peace Circle on Capitol grounds, at approximately 12:50 p.m.  *See* Ex. 1.[3]  As Westover stepped over the now-dismantled fencing and bike racks, he commented in a melodic voice, "barricades are down…the people are marching to the Capitol building…oh my, oh my."  *Id.*

Around this time, Westover live streamed several videos via Facebook.  For example, in one video that he deleted but acknowledged posting to social media, Westover stated something to the effect of "they have rubber bullets" and "they are about to disperse the crowd."  In another, he stated that the trio was "on the front line," as heavily outnumbered police can be seen in the background trying to deter the crowd from breaching a bike rack barricade on a set of steps outside the Capitol, just below the northwest scaffolding.  *See* Ex. 2 and Figure 1.  Indeed, the trio was firmly enmeshed within the front line of individuals who have been identified as Proud Boys, including Joe Biggs and Ethan Nordean,[4] and who were up against this barricade, as seen in Figures 1 and 2 (both derived from Ex. 2, which was recovered from Westover's Facebook

---

[3] All exhibits cited in this memorandum will be provided to the Court in advance of the sentencing hearing.
[4] Both have been charged in case number 21-cr-175 (TJK) with Obstruction of an Official Proceeding and Destruction of Government Property, among other charges.

account).  Westover then witnessed rioters forcibly remove the police barricade in front of him

and proceeded to follow them up the Capitol steps and past the retreating police officers.  *See* Ex.

2 and Figure 2.



*Figure 1*



*Figure 2*

Following these initial breaches, the trio joined a large crowd on the West Plaza at the

foot of the inaugural stage, behind yet another police line, by approximately 1:00 pm.  *See id.*;

*see also* Ex. 3.  For approximately an hour, there were continuing skirmishes with law

enforcement over fence lines.  By 2:03 pm, a riot had been declared, a recorded dispersal order

was being broadcast from a large speaker near the front of the inaugural stage, and law enforcement was deploying munitions into the crowd.

Indeed, Westover recorded a video on his cell phone showing these efforts to disperse the rioters. Ex. 3. In it, he stated that things were "getting a little crazy again…somebody fired off some large fireworks"—presumably referring to law enforcement's deployment of munitions, as heard in the video. *Id.* Sometime thereafter, Westover recorded a video in which he lamented getting "tear gassed again," adding "that's always fun." *See* Ex. 4. In the background, rioters can be seen climbing the scaffolding set up in preparation for the presidential inauguration. *Id.*

The trio proceeded to climb the stairwell beneath the northwest scaffolding, at times crawling underneath scaffold poles, while Westover recorded the moment on this cell phone. *See* Ex. 5. In the video, Westover exclaimed, "we're storming the gates of the Capitol here"; "this is happening"; and "we're going into our House." *Id.* The trio then ascended a set of steps to reach the Upper West Plaza. *See* Ex. 6. While walking up these steps, Westover shouted, "we're coming, Nancy!" *Id.* Other rioters chimed in, "I want Mitch"; "and now Pence." *Id.*

The trio then crossed the Upper West Plaza and approached the Senate Wing door. *See* Ex. 7. Westover recorded a video of this moment, stating, "this is not how I expected to visit the Capitol building for the first time ever." *Id.* He added that "thousands of other patriots [are] getting ready to walk into the Capitol." *Id.* In the video, an alarm is ringing loudly, broken glass is visible on the ground, and the Senate Wing door and adjacent windows have clearly been smashed.[5] *Id.* The trio ultimately breached the Capitol through the Senate Wing door at approximately 2:20 pm. *See id*; *see also* Figure 3 (a still from Capitol surveillance footage

---

[5] The windows were smashed out by rioters only seven minutes prior to the trio's breach.

depicting Westover in his blue and yellow St. Louis Blues hat).  To the left and right of the trio, rioters entered the building through the broken windows.



*Figure 3*

The trio then made their way through the Crypt, where rioters chanted: "Whose House? Our House!"; "stop the steal!"; and "where's the traitors?"  *See* Ex. 8 (a video recovered from Merry's iPad).  In response to this latter call, Merry shouted, "bring 'em out!"  *Id.*  In this area, Westover again complained of "tear gas."  *Id.*

The trio proceeded to approach the Speaker's Suite, while the mob, including Westover and Merry, chanted for "Nancy."  Ex. 9.  During this chant, Westover quipped, "I'm glad I already got my stimulus check."  *Id.*  As described above, Westover witnessed a rioter pry the Speaker's office suite sign off its post above a doorway and then smash it against a wall.  *See* Exs. 9, 10, 11,[6] and Figure 4 (recovered from Merry's cell phone).  He then watched as Hernandez picked up a shard of the sign from the floor, as Merry goaded her to "get a piece of

---

[6] Exhibit 9 was recorded by British media outlet ITV News and is publicly available here: https://www.youtube.com/watch?v=UBp42536IhE.

that."  *See* Exs. 9-11; Figure 5.  Merry and Hernandez then held up the shard to show it off to a

reporter with a camera, while Merry stated, "here you go, brother."  Ex. 11 and Figure 6.  As the

trio walked away from the Speaker's suite area, they listened to the rioter who had smashed the

sign rant to the reporter that "we respect the law, we were good people."  Ex. 11.  The rioter

added: "The government did this to us.  We were normal, good, law-abiding citizens and you

guys did this to us!  We want our country back!"  *Id.*  During this speech, Westover extended his

arm backwards to pat him on the shoulder, seemingly in approval of his sentiments.  *See id.*; *see*

*also* Ex. 9.



*Figure 4*



*Figure 5*



*Figure 6*

The trio ultimately reached the Rotunda, taking photos and videos.  Ex. 12.  While in the

Rotunda, Merry picked up a phone on a desk and pretended to call "Nancy"—i.e., Speaker

Pelosi.  *See* Ex. 9.  In his faux phone call, with Hernandez giggling in the background, Merry

ranted: "I've got an emergency: Nancy Pelosi is a c**t…let it all be known that Nancy Pelosi is a

c\*\*nt…I tried calling the c\*\*t Nancy but she wouldn't answer.  Nancy, Nancy, c\*\*t."  *Id.*
Westover then picked up the phone and chimed in, "Joe Biden?"  *Id.*

The trio ultimately exited the Capitol by crawling through a broken window next to the
Senate Wing doors at approximately 2:55 p.m.  *See* Figure 6.  In total, Westover spent nearly 40
minutes inside of the Capitol.  He has admitted that he knew at the time he entered the Capitol that
he did not have permission to do so, and that he knew Congress was due to convene to certify the
Electoral College votes that day.



*Figure 7*

Shortly after exiting the Capitol, Westover raised his arms in triumph and echoed the
sentiments of an interviewer who stated that he was a "hero[]… tak[ing] our country back" when
he exclaimed, "darn right."  *See* Ex. 13 and Figure 8.  He also recorded a video of Hernandez
holding up her loot—the shard of the Speaker's office sign—outside the Capitol near the
scaffolding.  *See* Ex. 14 and Figure 9.



*Figure 8*



*Figure 9*

In the days after the riot, Westover communicated frequently with Merry via text

message.  On January 7, 2021, they had the following exchange:

> Westover:  Hang in there brother. I'm praying for you. Your God is bigger than this
> whole thing is he knows your heart.
> Merry:  I'm okay brother how you doing trying to get some sleep but I can't
> Westover:  I'm a little uneasy but really feeling remorseful for you and Emily.
> Westover:  I'll sleep well tonight.
> Merry:  I won't

On February 3, the day after Hernandez's initial appearance in her matter in D.C., Merry wrote: "All went good yesterday for Emily lifted some of her restrictions, so that's good. I kinda feel a lil guilty that they haven't hurd from anyone. Emilys only one who got in trouble, none of this would have happened if she didn't have sticky fingers. I believe," to which Westover responded, "agreed."  He also invited Merry to install Signal an encrypted messaging application, on his phone.

Westover also communicated about the riot with friends and family via Facebook.  In one exchange, Westover wrote, "Yes, I'm public enemy number one…I'm not quite the thug they'd like me to be."

c.   *Destroying Evidence*

Westover has admitted that, after the attack on the Capitol, he deleted photographs and videos he recorded using his cell phone as well as took down or deleted from Facebook the live stream videos he recorded on January 6.  SOO ¶ 20.

d.   *Westover's Voluntary Interview with the FBI*

In anticipation of the plea agreement, Westover participated in a voluntary interview with the FBI and allowed law enforcement officers to review the digital contents of his phone and social media accounts.  Westover admitted to installing Signal after January 6, apparently on the recommendation of a journalist who said it was good for communicating.  Westover denied witnessing any assaults on law enforcement officers on January 6.  He did not express any remorse for his actions.

e.   *The Charges and Plea Agreement*

On January 27, 2021, Westover was charged by complaint with violating 18 U.S.C. §§ 231(a)(3), 1752(a)(1) & (2), and 40 U.S.C. §§ 5104(e)(2).  On February 4, 2021, he was

arrested in Missouri.  On November 29, 2021, Westover was charged by Information with one

count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the

Capitol Building.  He pleaded guilty to this charge on December 6, 2021.  By plea agreement,

Westover agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Westover now faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G).

As noted by the plea agreement and the U.S. Probation Office, Westover faces up to six months

of imprisonment and a fine of up to $5,000.  Westover must also pay restitution under the terms

of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072,

1078-79 (D.C. Cir. 2008).  Because this offense is a Class B Misdemeanor, the Sentencing

Guidelines do not apply.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating a sentence.  Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence,

§ 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as

described below, all of the Section 3553(a) factors weigh in favor of the government's proposed

sentence of a 90-day term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms—indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  Before entering the Capitol, Westover crossed through numerous barriers and barricades and heard the throes of a mob, chiming in with his own taunts for "Nancy."  As the video exhibits clearly show, Westover observed extensive efforts by U.S. Capitol Police to hold back the crowd, saw shattered windows at his location of entry, and smelled chemical irritants in the air.  He was far from a mere tourist that day.

Additionally, while looking at Westover's individual conduct, this Court must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored commands from law enforcement officials; and (9) whether the defendant has demonstrated  sincere remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Westover personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Westover's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Westover from most other misdemeanor defendants. Westover's lack of violence and property destruction is the only reason he was permitted to plead guilty to a misdemeanor rather than a felony.

As Exhibits 1 through 7 show, Westover was well aware of the force required to overwhelm law enforcement and make entry into the Capitol. In Exhibit 2, for example, Westover emphasized his proximity to that stand-off when he stated, "we are on the front line." He then witnessed rioters forcibly remove bike barricades and proceeded to storm past the outnumbered officers himself. Even though Westover was not the first to break the police line, he clearly sponsored those rioters' actions by posting this video on his Facebook.

Thereafter, Westover stayed in the area of continuing skirmishes with police for over an hour, despite increasing violence against law enforcement and clear signals that he was unlawfully present. As the police increased the force necessary to repel the crowd, Westover would have heard a dispersal order broadcast. In the videos he recorded, he acknowledged observing police firing increasingly powerful munitions into the crowd as well as the acrid smell of pepper spray in the air. *See* Exs. 3-4. Despite this, Westover chose to advance past the police line, which crumbled shortly before he ascended the steps beneath the scaffolding and entered the building.

Westover entered the building less than ten minutes after it was first breached at his location of entry. While no police officers blocked his path, there were clear signs of violent entry. There can be no question, based on Exhibit 7, that Westover saw that the window adjacent to the door he entered through had just been smashed out. Indeed, he panned his cell phone camera to

the broken glass on the ground just below that window.  *See* Ex. 7.  The video also makes clear that Westover heard the alarm sounding throughout the Capitol: a loud, high-pitched, continuous beeping similar to a smoke alarm.  *Id.*  He was aware that police on Capitol grounds were attempting to hold the mob back with rubber bullets.  SOO ¶ 12.  Even after Westover witnessed rioters violently smash Speaker Pelosi's office suite sign, he did not turn back.  Instead, he watched as his companions picked up the broken pieces of the Speaker of the House's sign and held them up as trophies for a news organization.  He then proceeded to the Rotunda, where he and Merry staged fake phone calls to Speaker Pelosi and President-Elect Biden, before exiting the Capitol through a broken window.  *See* Ex. 9.

Exhibit 14 is notable because it illustrates Westover's lack of remorse for his part in the violent attack on the Capitol.  Indeed, he echoes the interviewer's sentiment that he is a "hero" for "storming" the Capitol and "tak[ing] the country back" by stating "darn right" and goalposting his arms triumphantly.  His video of Hernandez proudly displaying the stolen fragment of the Speaker's sign also suggests that Westover believed her conduct was worthy of a trophy video. Finally, Westover admitted to destroying Capitol-related content from his cell phone and social media almost immediately after the attack, which may have prevented FBI agents from discovering even more damning evidence regarding his intent and understanding of his actions that day.

Accordingly, the nature and the circumstances of this offense establish the clear need for a significantly deterrent sentence in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Westover lacks a criminal history and has been compliant with his conditions of release.  He is the only employee of a successful STEM recruiting business that he owns.  Notwithstanding, a sentence imposing a period of incarceration is more than appropriate in

light of the aggravating factors and especially where the defendant has shown a lack of remorse. Indeed, the lead agent who conducted the voluntary interview of Westover expressed that he believed Westover thought the Capitol Breach investigation was a joke based on his demeanor toward investigators. Westover's nonchalant, sarcastic attitude towards the events of January 6 is further evinced by his private communications on Facebook, in which he stated, "Yes, I'm public enemy number one" and "I'm not quite the thug they'd like me to be."

Westover also appears to believe the predicament he is in is due to Hernandez's act of picking up the shard of Speaker Pelosi's sign, rather than his own actions in unlawfully breaching the Capitol as part of a mob. The day after the riot, Westover wrote Merry that he was "feeling remorseful for [Merry and Hernandez]," as if they were the only ones who committed illegal acts on January 6. Unlike Merry, who was suffering from insomnia, Westover was so comfortable with his conduct that he said he would "sleep well" that night. And the day before Westover and Merry were taken into custody, Westover agreed with Merry's assessment that "none of this would have happened if [Hernandez] didn't have sticky fingers." It therefore appears that Westover has not fully grasped the gravity of his own actions that day.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process." FBI Director Christopher Wray, Statement before House Oversight & Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats. oversight.house.gov/files/Wray%20Testimony.pdf. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including

misdemeanor cases, arising out of the January 6 riot. *Cf. United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

a.  *General Deterrence*

 The demands of general deterrence generally weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration, or some other combination of punitive terms.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes in this country: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.

18

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider in these cases.

      b. *Specific Deterrence*

Westover's actions and statements, both during and after the riot, clearly demonstrate the need for specific deterrence for this defendant. Westover celebrated the violence of the day after January 6 by posting Exhibit 2, a video where rioters forcibly break through the police line, to his Facebook. And rather than recoil in horror, he posed for a picture the moment rioters tore Speaker Pelosi's office sign off an entryway to her suite. *See* Figure 4. After the attack, he viewed himself as a "hero" for storming the Capitol to "take our country back." *See* Ex. 13. He also destroyed evidence, which could have shed additional light on his intent. And even as recently as his interview with Probation, he appears to view himself as a victim in this process. *See* PSR ¶ 48.

As of the date of this filing, Westover has not expressed remorse—not on social media, not in his FBI interview, not in his Probation interview, and not in his plea colloquy to this Court. The government acknowledges that the defendant has accepted responsibility by entering into this plea agreement. On the other hand, his failure to acknowledge the dangers and violence of January 6 and his apparent lack of remorse underscore the need for a term of incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this unprecedented assault on our Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement officers, to conspiracy to obstruct the congressional proceedings.[7]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probation-only sentence thus should not become the default.[8]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 (the court should not "create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous and thus treated more severely in terms of their conduct and subsequent punishment.

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  This table shows that the sentence requested in this case would not result in unwarranted sentencing disparities.

[8]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-97 (PLF); *United States v. Donna Sue Bissey*, 1:21-cr-165 (TSC), *United States v. Douglas K. Wangler*, 1:21-cr-365 (DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-365 (DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Those who trespassed, but engaged in aggravating conduct, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating conduct, deserve a sentence more in line with minor incarceration or home detention.

Westover has pleaded guilty to Count One of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," however, does apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.  Here, even though Westover, Merry, and Hernandez were not charged as coconspirators, their criminal conduct was entirely intertwined and mutually reinforcing.  For that reason, this Court should structure the sentence of each of these defendants in a manner that reflects the relative culpability of each vis-à-vis the other two.

This Court should also consider the sentences imposed in other Capitol Breach cases when fashioning a sentence for Westover.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed in other Capitol Breach cases for comparison.  For example, in *United States v. Edwards* (21-cr-366), this Court imposed a sentence of one year of probation, 200 hours of community service, a $2,500 fine, and $500 in restitution.  In that case, Edwards breached the Capitol and made it as far as Senator Merkley's office.  *See* Gov't Sentencing Memorandum, ECF No. 27, 21-cr-366.  According to his wife's social media post, Edwards witnessed rioters break down a barricade, break a window, and break furniture.  Edwards was not accused of engaging in violence or destruction of property himself.  Like Edwards, Westover witnessed rioters forcibly breach multiple police barricades and destroy government property; yet he continued to wander about the Capitol taking photos and videos as if he were a mere tourist.  Unlike Edwards, however, Westover

admitted to destroying evidence from his phone and Facebook account.  He also celebrated the theft of government property by Hernandez and Merry when he recorded a trophy video of Hernandez holding up the office sign of a primary target of the mob.  Westover and Merry also ominously chanted Speaker Pelosi's name, fanning the flames against a primary target of the mob. Westover also stood by as Merry made threatening faux phone calls to Speaker Pelosi and even joined in the gimmick.  And unlike Edwards, to date, Westover has not shown remorse for his conduct.  To the contrary, he held his arms up in triumph after storming the Capitol, echoing the sentiment that he was a "hero" for doing so.

The Government has requested, and the courts have imposed, sentences of incarceration in most cases where defendants gained entry to sensitive spaces inside of the Capitol Building. *See, e.g.*, *United States v. Mazzocco*, 1:21-cr-54 (TSC) (sentenced to 45 days of incarceration where defendant entered conference room area known as Spouse's Lounge); *United States v. Pham*, 1:21-cr-109 (TJK) (sentenced to 45 days of incarceration where defendant walked into office area with desks, a computer, and numerous paper files); *United States v. Bonet*, 1:21-cr-121 (EGS) (sentenced to 90 days of incarceration where defendant smoked marijuana in Senator's private office); *United States v. Ericson*, 1:21-cr-506 (TNM) (sentenced to 20 days of weekend incarceration where defendant entered Speaker's conference room and other office space;); *but see United States v. Marquez*, 1:21-cr-136 (RBC) (government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues).  Here, worse than entering a sensitive (but

empty) space, Westover celebrated the theft of a piece of the Capitol bearing the name of the person rioters were threatening to shoot in the head and hang.[9]

The Court should also refer to the sentences it imposed in *United States v. Derek Jancart and Erik Rau*, 1:21-cr-148 (JEB), as guideposts.  Jancart and Rau each received sentences of 45 days of incarceration.  They observed significant violence as they approached the Capitol building and cheered upon seeing it, similar to Westover, who bragged that he was "on the front line" as rioters skirmished with police.  *See* Ex. 2.  Like Westover, Jancart and Rau entered through the Senate Door shortly after it was breached.  The duo made their way to a highly sensitive area of the Capitol building—Speaker Pelosi's conference room—whereas Westover reached Speaker Pelosi's office suite where his travel companions held up smashed government property like a trophy.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court

---

[9] *See, e.g.*, *United States v. Pauline Bauer*, 21-cr- 386, ECF No. 2-1 ("They need to hang…Bring her out…Bring Nancy Pelosi out here now. We want to hang that f****** b****."); *United States v. Cleveland Meredith*, 21-cr-159, ECF No. 47 ("Thinking about heading over to Pelosi C[**]T's speech and putting a bullet in her noggin on Live TV")

might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      Conclusion**

Sentencing requires the Court to balance the § 3553(a) factors carefully.  Balancing these factors, the government recommends that this Court sentence Paul Westover to 90 days of incarceration and $500 in restitution.  Such a sentence promotes respect for the law and deters future crime by this defendant and others by imposing restrictions on his liberty, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:      *Jessica Arco*

Jessica Arco
D.C. Bar No. 1035204
Trial Attorney – Detailee
U.S. Attorney's Office
555 4th Street NW
Washington, DC 20530
Jessica.arco@usdoj.gov